UNITED STATES of America, Plaintiff,

v.

Jeffrey Jerome BARBER, Defendant.

No. 93–CR–83L.

United States District Court,
W.D. New York,
Criminal Division.

Sept. 10, 1993.*

Bradley E. Tyler, Asst. U.S. Atty., Rochester, NY, for plaintiff.

\* Editor's Note: Report and Recommendation adopted in full in an oral order of District Judge Larimer Oct. 7, 1993.

Daniel Aureli, Rochester, NY, for defendant.

## DECISION AND ORDER and REPORT AND RECOMMENDATION

FISHER, United States Magistrate Judge.

The defendant is charged in a one count indictment with possessing a firearm shipped in interstate commerce while having been convicted of a felony drug offense in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). Following defendant's arraignment he filed omnibus motions, including a motion to suppress evidence. These motions were referred to me by district judge David G. Larimer pursuant to 28 U.S.C. § 636(b)(1)(A)–(B). The following is my Decision and Order that defendant's omnibus motions be granted in part and denied in part as specified below, and my Report and Recommendation that the motion to suppress the gun and the motion to suppress defendant's statements be denied.

### I. *Motions for Discovery, for Brady Material, and for a Bill of Particulars*

The parties identified no continuing disputes concerning the status of Rule 16 discovery and defendant's various requests for *Brady* material. On the other hand, the government opposes a motion for a bill of particulars and defendant continues to wish that one be filed. For the reasons stated in *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990), I find that a bill of particulars is not necessary in this case. As in *Torres,* the six requests are an "ill-disguised attempt at general pre-trial discovery." *Id.,* 901 F.2d at 234 (quoting the district court's unpublished memorandum pertaining to defendant Cruz). As a separate matter, the court would not be inclined in view of the broad discovery afforded by the government to grant a bill of particulars as a matter of discretion. The motion to compel the filing of a bill of particulars is denied.

### II. *Motion for Disclosure of Grand Jury Proceedings*

Defendant moves to inspect the grand jury minutes primarily for the purpose of discovering whether sufficient evidence was given to the grand jury and to determine whether the instructions given to the grand jury by the government's attorney were adequate. This motion is denied. "A review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct." *United States v. Torres,* 901 F.2d 205, 233 (2d Cir.1990), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). Defendant makes no factual showing in this case, and virtually admits that he cannot make such a showing.

Accordingly, "[c]ounsel's unsupported view that abuses may have occurred ... with respect to the grand jury system is insufficient in this case to overcome the presumption of regularity of the grand jury proceedings and does not justify disturbing the traditional secrecies surrounding such proceedings." *United States v. Wilson,* 565 F.Supp. 1416, 1436–37 (S.D.N.Y.1983), quoted in *United States v. Marquez,* unpublished 1992 WL 88139 (S.D.N.Y. April 22, 1992), and cited with approval in *United States v. Torres,* 901 F.2d at 233. *See also, United States v. Piedrahita,* 791 F.Supp. 418, 420 (S.D.N.Y.1992). Furthermore, an indictment cannot be dismissed, if facially valid, on the ground of insufficient evidence presented to the grand jury. *Id.,* 791 F.Supp. at 420–21. *See United States v. Williams,* — U.S. —, — – —, 112 S.Ct. 1735, 1745–46, 118 L.Ed.2d 352 (1992). *Cf. United States v. Roshko,* 969 F.2d 1, 1 (2d Cir.1992) ("federal court review of grand jury proceedings is limited"). The motion for inspection is denied.

### III. *Motion in Limine*

Defendant moves to preclude the prosecutor from cross examining him at trial with respect to prior bad acts. A hearing on this motion is granted, and deferred to the district judge who will try the case at the final pre-trial conference.

## IV. *Report and Recommendation on Motion to Suppress*

In his original omnibus motions, defendant moved to suppress the loaded gun found in the trunk of his aunt's vehicle concealed in a teal blue gym bag. It is this weapon which is the subject of the felon-in-possession-of-a-weapon charge. The original motion papers allege that the traffic stop of defendant's aunt's vehicle was a pretext for a full search of the vehicle and that the search was otherwise in violation of the warrant clause of the Fourth Amendment. Furthermore, defendant contends that he did not consent to the search and that, even if he had consented, "it [wa]s unreasonable for the law enforcement officials to make such a request" for a consent.

Defendant's supplemental motion to suppress adds that probable cause was lacking for the police to make any inquiry regarding the contents of the vehicle, and that defendant was effectively under arrest by the "numerous law enforcement officers" at the scene who were armed and ordered defendant to get out of the vehicle. In his supplemental motion papers, defendant also moves to suppress statements he made at the scene. Finally, the court has accepted defendant's oral motion to suppress statements he made to an investigator at the stationhouse because the government chose to present proof of it at the suppression hearing, and requested an adjournment of the hearing for the purpose of developing the facts of the stationhouse interrogation. *See* letter of Bradley E. Tyler, AUSA, dated July 27, 1993, and attachment. Defendant makes no discrete challenge to the voluntariness of the statements, but moves to suppress on the ground that the standard pre-interrogation *Miranda* warnings were not properly administered. The hearing was held August 31, 1993.

### A. *The Hearing Testimony*

Monroe County Deputy Sheriff Tyler Barrus testified that in the very early morning hours of January 20, 1993, he stopped a maroon Cadillac travelling northbound on Scottsville Road in western Monroe County. Barrus was travelling southbound at the time, and noticed that the Cadillac's back window was heavily tinted with two inch lettering which spelled "CAT." Barrus decided to stop the Cadillac and cite the driver for a violation of the New York Vehicle and Traffic Law relating to car windows modified to obstruct the view through the rear portion of the car. When Barrus approached the driver's window of the maroon Cadillac, he asked the driver to produce the customary identification documents. The driver explained that he had no "paperwork," but he identified himself as Jeffrey Jerome Barber and revealed his date of birth. Barrus went back to his patrol car to "run the data" through the Sheriff's Department computer system.

While Barrus was awaiting the results of the computer search, a second car pulled up, slowed, and then went on down Scottsville Road where it turned around, came back and parked in a Sugarcreek convenience store parking lot. The second car was a Chevrolet Chevette. Barrus observed a black male exit the Chevette and approach on foot as a third car, a Toyota, arrived on the scene. The man entered the Toyota. Barrus immediately summoned Deputy Sheriff Lance Hine to the scene for backup. New York State Troopers also appeared on the scene.

Thereafter, Barrus heard on his radio that the defendant was not the registered owner of the vehicle and that defendant's license was revoked, and had been suspended several times. Barrus determined that he should write an additional ticket to the defendant charging him with unlicensed operation of the car. Barrus also determined to find a licensed driver from among what he considered to be defendant's companions, who had arrived on the scene in the Toyota and Chevette.

The radio dispatch also informed Barrus that defendant had been arrested on a number of occasions, but his Department's computers did not reveal the nature of the arrests or dispositions. Deputy Hine, who arrived on the scene, contacted the Rochester City Police Department Records Unit and "ran defendant's name, his date of birth, and the moniker CAT" (the latter through the City Police Department's "clue record"). Hine learned that defendant had been con-

victed of a "B felony sale of narcotics" and he learned further that there had been other drug arrests involving the defendant in the city. When Barrus learned of this information, he determined to summon the Sheriff's Department Canine Unit to search for drugs. Within minutes, Sergeant Thomas E. McShea arrived with his narcotics dog Mark. The original stop had occurred at 2:00 a.m. on the morning of January 20th. Barrus testified that he requested the canine unit at 2:25 a.m., and both he and McShea testified that McShea arrived at 2:35 a.m.

Barrus set out to find a licensed driver to care for the maroon Cadillac. Upon inquiry, the passenger in the maroon Cadillac admitted that he was unlicensed. Barrus then turned to the Toyota, which was parked in front of the Cadillac. The individual who drove the Chevette to the Sugarcreek parking lot was, by that time, in the passenger seat of the Toyota. He identified himself as Louis Barber, the cousin of the defendant. Louis Barber also was an unlicensed driver. Barrus found that the driver of the Toyota was licensed but he could not drive the Cadillac because he had to care for the Toyota. Meanwhile, the two New York State Troopers who arrived on the scene were directed by Barrus to examine the Chevette and obtain information using the license plate and registration as source materials. When they did so, the troopers observed a shotgun on the front seat. The troopers seized it, finding a round in the chamber and the safety in the "off" position. This was the car that Barrus observed defendant's unlicensed cousin driving before the cousin walked over to the Toyota.

When asked why he detained the defendant to facilitate the canine search, Barrus testified that there were many factors which led to his decision, but when pressed could

only identify the facts of the prior conviction together with the discovery of the loaded weapon in the Chevette as justifying the detention. Barrus acknowledged that he did not see anything in the Cadillac to suggest criminal activity, and that the defendant did not say anything to him which aroused any further suspicion of criminal behavior. The only infraction observed was the traffic infraction and the discovery that defendant was unlicensed. Barrus conceded that no weapons were found in the Cadillac itself, that defendant posed no particular threat to him at the time, and that defendant was cooperative. But Barrus could not find anyone licensed to drive the Cadillac.

Sergeant McShea testified that, upon arrival at the scene, he went to the maroon Cadillac and addressed the defendant. McShea thought that he might have received some briefing from Deputies Barrus and Hine, but he could not remember what he was told. In accordance with what he described at the hearing as his usual practice, McShea intended to solicit the consent of the driver for a canine search, and he asked defendant to exit the vehicle for the purpose of eliciting the consent. When defendant complied, McShea immediately observed significant bulges in both of defendant's pants pockets. McShea "patted him down for safety" and felt what he perceived to be paper in defendant's pockets. Reaching into the pockets, McShea retrieved "wads" of currency totalling $2288.[1] McShea placed defendant in Deputy Carpenter's patrol car (the testimony did not reveal when Carpenter arrived), and then secured the money in his own vehicle.

After securing the money, McShea went back to Deputy Carpenter's patrol car to obtain the consent of the defendant to a search of the maroon Cadillac. McShea

---

1. The government represented to the court at the hearing that it did not seek to use the currency in its evidence in chief. Whether this is because the government views the situation as a *Terry* stop and an impermissibly extended pat down frisk under the holding in *Minnesota v. Dickerson*, ––– U.S. –––, –––––––, 113 S.Ct. 2130, 2138–39, 124 L.Ed.2d 334.(1993), or because the relevance of the currency to the felon-in-possession charge is doubtful, was not revealed at the hearing. A proper determination of the issues involved in

defendant's suppression motion, however, does not depend upon whether discovery of the currency was lawful, because defendant does not contend in his motion papers or argument that the seizure of the currency in any way contributed in a functional sense to the discovery of the firearm in the trunk of the maroon Cadillac. *Cf. New York v. Harris*, 495 U.S. 14, 19–20, 110 S.Ct. 1640, 1643–44, 109 L.Ed.2d 13 (1990) (attenuation not an issue under fruit-of-the-poisonous-tree inquiry until causation is first established).

asked defendant, "Would you not mind if I search your car with my canine dog Mark." Defendant replied that it was "alright, there is nothing in the car." McShea then began the canine search with his dog Mark. Mark, who is state certified and trained in many narcotics, did not smell drugs in the interior of the vehicle. He only showed "some interest" in the armrest of the vehicle. When the dog searched the exterior of the vehicle, however, Mark showed interest in the trunk area. McShea, who by then had the keys to the car, opened the trunk. Mark jumped into the trunk and fully "alerted" on a blue or teal gym bag and its zipper seams. McShea took the dog back to his patrol car while other deputies opened the gym bag. When McShea returned to the Cadillac, he observed a MAC 11–type weapon with another clip containing ammunition. The deputies found that the gun was loaded.

Defendant was taken to the stationhouse, where at about 6:25 a.m. he was advised of his rights by Monroe County Sheriff's Investigator Douglas Hinchey. Hinchey testified that he read the *Miranda* rights to defendant from a form which was admitted as Exhibit # 2. Defendant waived his rights, signed the form, and Hinchey began to talk with the defendant. Hinchey asked the defendant about the maroon Cadillac. Defendant replied that it was his aunt's car, that he paid the bills on it, and that he had made the modification to the windows. Asked why he allowed a search of the Cadillac, defendant said, "I forgot the gun was in the car." Defendant admitted that he had spent a year in prison and that he had finished parole time with respect to a prior offense. When Hinchey explained to defendant that carrying a loaded firearm in a vehicle was a crime and that a felon in possession of such a weapon was a separate crime, defendant invoked his right to silence by indicating that he didn't want to talk with Hinchey anymore. Hinchey testified that the defendant could well have been handcuffed during the interview, although he was not sure.

**B.** *Seizure of the Gun*

Analysis of whether the warrantless seizure of the gun from the trunk of the Cadillac is tainted by defendant's detention until the canine unit arrived on the scene begins with consideration of *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) and *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). Both these cases held that a full search of a defendant stopped for a traffic violation is permissible if a custodial arrest for the traffic violation was otherwise authorized and effected by the officer. Both cases involved arrests for unlicensed driving (in *Robinson* the license was revoked). The Court expressly reserved the issue whether there are traffic offense arrest situations in which it would not be "reasonable" under the Fourth Amendment to make a full custodial arrest. *United States v. Robinson,* 414 U.S. at 236 n. 6, 94 S.Ct. at 477 n. 6; *Gustafson v. Florida,* 414 U.S. at 265–67, 94 S.Ct. at 492 (Stewart, J., concurring). The matter still seems to be open for the Supreme Court to resolve. *Cummins v. United States,* —— U.S. ——, ——, 112 S.Ct. 428, 429, 116 L.Ed.2d 448, 449 (1991) (White, J., dissenting from denial of certiorari) (in which the defendants claimed that the decision to effect a full custodial arrest for a traffic stop was unreasonable "because no reasonable police officer *would* have made such traffic stops and hence the stops were pretexts to investigate other crimes for which there were not grounds to stop").

Since *Robinson* and *Gustafson,* the circuits have split on the issue, usually in cases involving a claim that the traffic stop and arrest was a pretext for a search for narcotics.[2] As Judge Posner observed,

> If the only reasonable basis for stopping ... [the defendant] had been his commission of minor traffic offenses, and the real reason for the arrest had been a pure hunch that he was carrying drugs, then we would have a true case of pretext, and several courts would hold the stop and ensuing arrest illegal. *United States v. Guzman,* 864 F.2d 1512, 1515–18 (10th Cir.

---

**2.** In fact the defendant in this case claims that "[t]he pretense of seizing the vehicle was pursu-

ant to a traffic violation." Aureli affidavit at p. 17.

1988); *United States v. Smith*, 799 F.2d 704 (11th Cir.1986). But this court would not, having rejected the concept of unlawful-because-pretextual searches in *Trigg*. *United States v. Cardona–Rivera*, 904 F.2d 1149, 1153–54 (7th Cir.1990) (referring to *United States v. Trigg*, 878 F.2d 1037 (7th Cir.1989), *after remand*, 925 F.2d 1064 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991)). In *Trigg*, the court rejected a pretext inquiry and stated: "The Supreme Court has never indicated that discretionary exercise of the arrest powers is constitutionally significant; instead the court has stated, '[i]t is sufficient that the officer had probable cause to arrest and that he lawfully effected the arrest and placed the petitioner in custody.'" *United States v. Trigg*, 925 F.2d at 1065 (quoting *id.*, 878 F.2d at 1041). Subsequently, the Seventh Circuit explained its *Trigg* ruling as "eschew[ing] ... the subjective motive examination ... and "articulat[ing] a two pronged objective inquiry into the lawfulness of the allegedly pretextual stop or arrest: we ask first whether law enforcement authorities had reasonable suspicion to make the stop or probable cause to make the arrest, and second, whether the officers involved were authorized under state or municipal law to effect the stop or arrest in question." *United States v. Fiala*, 929 F.2d 285, 287 (7th Cir. 1991) (citing *Trigg*, 878 F.2d at 1041). The Tenth and Eleventh Circuit cases cited by Judge Posner for the alternative rule, *see also, United States v. Valdez*, 931 F.2d 1448 (11th Cir.1991), all uphold the arrest, "not if an officer legally *could* have stopped the car in question because of a suspected traffic violation, but rather if 'a reasonable officer *would* have made the seizure in the absence of illegitimate motivation.'" *United States v. Rusher*, 966 F.2d 868, 876 (4th Cir.1992) (emphasis in original) (declining to make a choice between the two rules because, on the facts, both tests were satisfied), *cert. denied*, — U.S. —, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992). *Compare id.*, 966 F.2d at 885–89 (Luttig, J., concurring) (scholarly discussion of the cases and concluding that the *Trigg* objective approach is constitutionally mandated).

Cases agreeing with the *Trigg* formulation include *United States v. Cummins*, 920 F.2d 498, 500–01 (8th Cir.1990), *cert. denied*, — U.S. —, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991) and *United States v. Causey*, 834 F.2d 1179, 1184–85 (5th Cir.1987) (en banc). *See also, United States v. Shabazz*, 993 F.2d 431, 435 n. 3 (5th Cir.1993) (collecting cases and "not[ing] too that most circuits agree with *Causey*" [and therefore the identical analysis in *Trigg*]). Justice White placed the Second Circuit in with the other circuits agreeing with *Trigg*. *Cummins v. United States*, — U.S. at —, 112 S.Ct. at 429 (White, J., dissenting from denial of certiorari), and upon an analysis of the case he cited, *United States v. Nersesian*, 824 F.2d 1294, 1316–17 (2d Cir.1987) (observing that "courts have frequently discounted the subjective intent or motivations of searching officers" and supporting this objective approach by reference to a pretext case), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987), this court does also, although recognizing that *Nersesian* is not precisely on point because it did not involve a traffic stop of a vehicle. The *Nersesian* holding is more general, however, and recognizes controlling Supreme Court precedent requiring district courts to decide the cases objectively. *Id.*, 824 F.2d at 1316 (citing *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978); *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985)). *See also, United States v. Rusher*, 966 F.2d at 887 n. 5 (Luttig, J., concurring) (placing *Nersesian* in the objective approach category). The objective approach has always been the law in this circuit. *United States v. Jenkins*, 496 F.2d 57, 72–73 (2d Cir.1974); *United States v. Tramontana*, 460 F.2d 464, 466 (2d Cir.1972) (objective standard "is no less necessary when a mistake on the part of a police officer is arguably beneficial to the accused").[3]

---

**3.** I therefore cannot follow my learned colleague's otherwise excellent discussion of this issue, which concluded that the subjective test of *Smith–Guzman*, which had been formulated earlier in this district, *United States v. Millio*, 588 F.Supp. 45 (W.D.N.Y.1984), was mandated because of "the absence of clear authority from the Second Circuit." *United States v. Clark*, 822

■ Accordingly, I apply here the purely objective approach, which focuses on whether there was probable cause for the stop and arrest, and whether the officers had lawful authority to make the custodial arrest. *Cf. id.* 824 F.2d at 1316 ("pretextual basis" offered by one investigating officer "does not alter the validity of the initial detention or the sequence of events following in its wake"). *See also, United States v. Glover,* 957 F.2d 1004, 1010 (2d Cir.1992) (validity of *Terry* stop "not dependent on the intentions or motivations of the particular detaining officers").

The issue here, unlike most of the pretext cases since *Robinson* and *Gustafson,* involves a consent search of defendant's car incident to the arrest and the claimed invalidity of the detention pending arrival of the canine unit when defendant's consent to search was solicited, not a full search of defendant's person incident to the arrest. But the same rationale applies, because if defendant could lawfully be placed under a full custodial arrest,

his detention at the scene may not be circumscribed by any temporal limitation applicable to *Terry* investigative stops. *United States v. Fiala,* 929 F.2d at 288 ("the 1½ hour roadside detention of Fiala while the troopers awaited the arrival of a drug-sniffing dog was not unreasonable ... [because] [e]ven if Fiala wasn't detained at the roadside pending the dog's arrival, he would have been detained anyway in McLean County Jail as a result of his arrest for driving without a valid license"). *Cf. United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985) ("difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest"); *United States v. Shabazz,* 993 F.2d at 435–38 (applying *Terry v. Ohio,* to a motorist stop and considering whether "a detention has exceeded its lawful duration," *id.,* 993 F.2d at 436, and had become "tantamount to a *de facto* arrest, a more intrusive custodial state which must be based upon probable cause rather than

---

F.Supp. 990, 1005 (W.D.N.Y.1993). In any event, as the district judge's opinion affirming the magistrate judge's order expressly stated, the pretext holding was "not necessary" to the decision in that case. *Id.,* 822 F.Supp. at 996.

So too I reject *United States v. Scopo,* 814 F.Supp. 292 (E.D.N.Y.1993). Unlike *Clark,* the court in *Scopo* attempted to distinguish *Nersesian,* but did not precisely explain why it was not controlling or send a clear signal to district court on the proper choice between an objective and subjective approach. *Id.,* 814 F.Supp. at 302–03. It is true that *Nersesian* involved one officer's action on the scene being duplicated by another, the latter of whom had questionable motivations and offered a pretext. But, as the breadth of the court's opinion makes clear, the timing factor was fortuitous to the proper result. Nothing in the *Nersesian* opinion suggests that the holding would have been different if the second officer with a pretext had, in fact, acted first (assuming that the first officer had the requisite cause to take the same action at the same point in time). The opinion cannot be read to suggest that the improper motivation of one officer is controlling, for Fourth Amendment purposes, if it acts before the officer having good motivation has a chance to effect a similar detention and search upon adequate cause (objectively viewed).

In addition, *Scopo*'s interpretation of *United States v. Caming,* 968 F.2d 232 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 416, 121 L.Ed.2d 339 (1992) as reviving the subjective motivation or pretext approach in this circuit misses the point of that case, which was that, as a purely factual matter, there was no pretext for

the seizure and search. *Id.,* 968 F.2d at 235–36. Thus, the court had no occasion to address whether a pretextual motivation, if present, would taint an otherwise valid and constitutional arrest and search. The reliance in *Scopo* on the legal standard employed by the district court in *Caming,* quoted in *id.,* 968 F.2d at 235, based as it was on pre-*Nersesian* authority (indeed pre-*Robinson–Gustafson* authority), fully fails to acknowledge that the circuit court was reviewing the district court's factual finding only, not the legal standard to be applied once pretextual motivation is, as a factual matter, present in the case. In such circumstances, quotations in *Caming* of the subjective legal standard used by the district court cannot truly "sugges[t] that the pretext doctrine retains vitality in this circuit[,]" *United States v. Scopo,* 814 F.Supp. at 303, especially when it is so at odds with the categorical approach taken in *Nersesian.*

In this case, although the initial stop of defendant's maroon Cadillac with excessively tinted windows did not appear pretextual, at least in its entirety, Deputy Barrus candidly admitted that he became almost immediately interested in searching for narcotics, and that he was so interested on the basis of unarticulated criteria which could not, because of its unarticulated basis, supplement the meager information provided by defendant's criminal record and the discovery of the gun in the other car. A plausible basis for pretext with respect to the continued detention of defendant pending arrival of the narcotics dog is, therefore, presented and cannot be resolved without delving into the subjective motivations of the arresting officers.

mere suspicion[,]" *id.*, 993 F.2d at 437); *United States v. Glover*, 957 F.2d at 1011–12. The focus here is upon the justification for the detention prior to defendant's consent, because *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) only authorizes a search of the passenger compartment of the car and its containers as incident to an arrest. *E.g.*, in the same context, *United States v. Fiala*, 929 F.2d at 288 (*Belton* obviates consent analysis because drugs found in passenger compartment). Here, the gun was found in the trunk concealed in a bag after the dog showed only "some interest." There was no canine alert supplying probable cause, *United States v. Glover*, 957 F.2d at 1013, until the trunk was opened and the dog jumped in. The opening of the trunk, therefore, depended upon defendant's consent for lawful justification, and that consent in turn depended upon the legality of defendant's 35–40 minute detention before the consent was given. With these principles in mind, I turn to the lawful basis of defendant's custodial arrest.

■ Defendant does not seriously question, after the hearing testimony was adduced, Barrus' right to stop the Cadillac. Barrus reasonably believed that he had probable cause to stop the driver of the car for violating N.Y.Veh. & Traf.Law § 375(12–a)(b)(4) (as amended by L.1991 ch. 155) (excessively tinted windows so as to obstruct "a clear and full view of the road and condition of traffic behind such vehicle") (formerly § 375(12–a)(b)(3)). *See also, id.* § 375(30) (prohibiting operation of vehicle "with any object placed or hung upon . . . in such manner as to obstruct or interfere with the view of the operator through the windshield, or to prevent him from having a clear and full view of the road and condition of traffic behind such vehicle.") Barrus testified that he observed an excessively tinted rear window with two inch lettering on the rear window of the Cadillac. This was sufficient to provide probable cause to believe that a traffic infraction was occurring, and to justify Barrus in stopping the car. *E.g., People v. Osborne*, 158 A.D.2d 740, 741–42, 551 N.Y.S.2d 336 (3rd Dept.1990).

■ Furthermore, and quite without regard to whether, as defendant contends, Barrus never verified the existence of the view obstruction, Barrus encountered another violation of the law when defendant failed to produce his driver's license or other identification. Under New York law, a simple failure to carry a valid license while operating a car is "presumptive evidence that he [the driver] is not duly licensed," N.Y.Veh. & Traf.Law § 507(2), and defendant's failure to do so "justifie[d] a police officer's immediate arrest of the unlicensed operator." *People v. Watson*, 177 A.D.2d 676, 576 N.Y.S.2d 370 (2d Dept.1991) (citing N.Y.Veh. & Traf.Law § 509, and adding that, because defendant was the only occupant of the vehicle, its impoundment and inventory search was reasonable); *People v. Miller*, 149 A.D.2d 538, 541, 539 N.Y.S.2d 809 (2d Dept.1989) (in dicta, stating that a full custodial arrest was authorized upon defendant's failure to produce a driver's license). Indeed, defendant had no identification documents with him, and therefore "[o]nce it became evident that defendant could not be issued a summons on the spot because of his inability to produce any identification, the officers were warranted in arresting him to remove him to the police station," *People v. Ellis*, 62 N.Y.2d 393, 396, 477 N.Y.S.2d 106, 465 N.E.2d 826 (1984), and in "search[ing] . . . defendant's person incident thereto . . ." *People v. Copeland*, 39 N.Y.2d 986, 987, 387 N.Y.S.2d 234, 355 N.E.2d 288 (1976). In a helpful case, the Court of Appeals observed, "there is, perhaps, an area of traffic violation 'arrest' where a full-blown search is not justified, but it might seem to be confined to a situation where an arrest was not necessary because an alternative summons was available or because the arrest was a suspect pretext." *People v. Troiano*, 35 N.Y.2d 476, 478, 363 N.Y.S.2d 943, 323 N.E.2d 183 (1974). The court explained that, if the right to search "is to be restricted, the cure must be by limiting the right to arrest or to take into custody[,]" not by limiting the right to a full search incident to a lawful arrest. *Id.*, 35 N.Y.2d at 478, 363 N.Y.S.2d 943, 323 N.E.2d 183. But no such limitation appears in the New York

State statutes,[4] or in the cases, and in any event *Ellis* and *Copeland* fully establish the right to make a full custodial arrest under New York law when the defendant fails to produce a driver's license.

■ Accordingly, defendant could have been arrested and searched immediately after he failed to produce his license under the rationale of *Robinson* and *Gustafson,* as interpreted in the line of cases including *Trigg,* and the fact that it was McShea who made the arrest some time thereafter, by asking defendant to step out of the car when he again failed to produce identification documents and by placing him in a patrol car,[5] does not affect the constitutional analysis. *United States v. Tramontana,* 460 F.2d 464, 467 (2d Cir.1972) (defendant cannot benefit simply because officer mistaken as to when probable cause arose). *Cf. United States v. Jenkins,* 496 F.2d 57, 73 (2d Cir.1974); *United States v. Riggs,* 474 F.2d 699, 704 (2d Cir.1973) (Friendly, J.).[6]

■ Defendant raises no substantial issue regarding the consensual nature of his authorization to McShea. The exchange was innocuous enough and defendant later explained to the investigator that he had simply forgotten that the gun was in the trunk when he gave his consent to search. Accordingly, I find that the consent was voluntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Furthermore, the scope of the consent with respect to the car was unlimited and therefore included the trunk. *Florida v. Jimeno,* 500 U.S. 248, ——, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297 (1991) ("did not place any explicit limitation on the scope of this search"); *United States v. Davis,* 967 F.2d 84, 87–88 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 356, 121 L.Ed.2d 270 (1992); *United States v. Harris,* 928 F.2d 1113, 1117 (11th Cir.1991). Therefore, the opening of the trunk was justified. The dog search provided probable cause to believe that the gym bag contained narcotics, *United States v. Glover,* 957 F.2d 1004, and even if defendant's unrestricted consent might be said to have not included the gym bag in the trunk, *but see United States v. Rich,* 992 F.2d 502, 507 & n. 3 (5th Cir.1993), the probable cause then existing justified the search of the bag without a warrant. *California v. Acevedo,* 500 U.S. 565, ——, 111 S.Ct. 1982, 1991, 114

**4.** In traffic offense situations, *see* N.Y.Veh. & Traffic Law § 155 ("For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense."), full custodial arrest authority is implied in N.Y.Crim. Proc.Law § 140.20(1)(d) (authorizing the officer making a traffic arrest to take defendant to any local criminal court in the county), N.Y.Crim. Proc.Law § 140.20(2)(a) (authorizing the police at the stationhouse discretion to "fix pre-arraignment bail" and "issue an appearance ticket upon the arrested person *and release him from custody*") (emphasis supplied), and N.Y.Crim.Proc. Law § 150.20 (giving officer discretion to issue appearance ticket in lieu of arrest pursuant to § 140.10). The only limitation appears to be in petty marijuana offense cases where that is the sole offense involved. N.Y.Crim.Proc.Law § 150.75. The Supreme Court has recognized this. *New York v. Class,* 475 U.S. 106, 118, 106 S.Ct. 960, 968, 89 L.Ed.2d 81 (1986) ("a formal arrest, ... would have been permissible for a traffic offense under New York law").

**5.** Defendant challenges the order to get out of the car. McShea's decision to ask defendant to step out of the car was permissible because defendant was already lawfully subjected to a full custodial arrest, and would have been permissible in any event even if the excessively tinted windows had been, at the time, the only violation observed. *New York v. Class,* 475 U.S. 106, 115, 106 S.Ct. 960, 966, 89 L.Ed.2d 81 (1986); *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977); *People v. Robinson,* 74 N.Y.2d 773, 774, 545 N.Y.S.2d 90, 543 N.E.2d 733 (1989).

**6.** If *Terry* applies—i.e., if the foregoing analysis is not accepted and the court must view the matter as an investigative detention, *Berkemer v. McCarthy,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) ("The usual traffic stop is more analogous to a so-called '*Terry* stop' than to a formal arrest" for *Miranda* purposes)—defendant's 35–40 minute detention prior to his consent is not violative of the Fourth Amendment's reasonableness clause. *United States v. Shabazz,* 993 F.2d at 437; *United States v. Nurse,* 916 F.2d 20, 24–25 (D.C.Cir.1990). Barrus testified that the usual traffic stop lasts some 15–20 minutes, depending on DMV record checks, and his testimony clearly revealed that the delay was reasonably related to the legitimate investigation of the law enforcement officers: even absent their interest in narcotics detection. *United States v. Sharpe,* 470 U.S. 675, 687, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985); *United States v. Shabazz,* 993 F.2d at 437–38.

L.Ed.2d 619 (1991) ("police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.") It is my Report and Recommendation that the motion to suppress the gun be denied.

### C. Defendant's Statements to the Police

As I understand the government's position, it seeks to use the interchange between McShea and the defendant concerning the consent to search the car, and a statement made to investigator Hinchey some four hours later at the stationhouse, in its evidence-in-chief. First, with respect to defendant's statement to McShea that it was alright to search the car and that there was nothing there, it is undisputed that no *Miranda* warnings were given to defendant. By the time McShea asked defendant for the consent, the investigative detention of defendant pursuant to the traffic stop had developed into a custodial situation even though defendant was not yet formally arrested. In *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court held that "the usual traffic stop is more analogous to a so-called 'Terry stop' see, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), than to a formal arrest." *Berkemer v. McCarty,* 468 U.S. at 439, 104 S.Ct. at 3150. *See also, United States v. Wong Ching Hing,* 867 F.2d 754, 756 (2d Cir.1989). The Court recognized, however, that, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda." Berkemer v. McCarty,* 468 U.S. at 440, 104 S.Ct. at 3150.

An example offered by the court to suggest a situation in which custody might have occurred was the case of *Commonwealth v. Meyer,* 488 Pa. 297, 412 A.2d 517 (1980) in which the "driver who was detained for over ½ hour, part of the time in a patrol car, [and was therefore] held to have been in custody for the purposes of *Miranda* by the time he was questioned concerning the circumstances of an accident." *Berkemer v. McCarty,* 468 U.S. at 441 n. 34, 104 S.Ct. at 3151 n. 34. Of course, that is the situation in this case, because McShea asked defendant after at least a ½ hour detention to step out of his car, whereupon McShea frisked him and placed him in a patrol car before requesting the consent. In *Pennsylvania v. Bruder,* 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988), the Court confirmed that "Meyer involved facts which we implied might properly remove its result from *Berkemer's* application to ordinary traffic stops; specifically, the motorist in *Meyer* could be found to have been placed in custody for purposes of *Miranda* safeguards because he was detained for over ½ hour, and subjected to questioning while in the patrol car." *Id.,* 488 U.S. at 11 n. 2, 109 S.Ct. at 207 n. 2. Although not an explicit holding on the topic, I consider this to be rather a clear signal, and accordingly hold that the defendant in this case was in custody for purposes of *Miranda* when McShea asked him for consent to search the car.

Finding that he was in custody for *Miranda* purposes, however, is not determinative of the issue. The issue further remains whether the simple request to search the car was a question designed, or which the officer reasonably should suspect, would result in an incriminating answer. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (interrogation within the meaning of *Miranda* is "words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect"). McShea simply asked the defendant whether he would mind if the car was subjected to a canine search. A request to search is ordinarily not considered interrogation unless it goes beyond a simple request to search by, for example, inquiring of the car's ownership. *United States v. Glenna,* 878 F.2d 967, 971 (7th Cir.1989) (collecting cases); *United States v. Faruolo,* 506 F.2d 490, 495 (2d Cir.1974). *Compare United States v. Henley,* 984 F.2d 1040, 1043 (9th Cir.1993) (inquiry concerning ownership is interrogation); *United States v. Monzon,* 869 F.2d 338, 342 (7th Cir.1989) (same), *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989). Accordingly, defen-

dant's additional response to McShea's request for consent, which indicated that nothing was in the car, is admissible because it was not the product of interrogation within the meaning of *Miranda*, and it is my Report and Recommendation that the motion to suppress defendant's statements to McShea at the scene be denied.

Defendant raises no substantial issue concerning the stationhouse statement. It is clear that he was adequately advised of his *Miranda* rights and that he waived the same. *See* Hearing Exhibit #2 (the waiver form showing the rights read to defendant and defendant's waiver). *Duckworth v. Eagan,* 492 U.S. 195, 204, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166 (1989) ("initial warnings ... touched all the bases required by *Miranda*"); *United States v. Anderson,* 929 F.2d 96, 98 (2d Cir.1991) (defendant "had his *Miranda* rights brought home to him in an intelligible fashion"). No circumstances were adduced at the hearing which would tend to show that the statement was otherwise involuntary. Indeed, defendant promptly invoked his right to silence once confronted with the possible charges that could be lodged against him. Therefore, the statements made to Investigator Hinchey at the stationhouse are admissible and it is my Report and Recommendation that the motion to suppress these statements be denied.

The parties should be on notice that, pursuant to 28 U.S.C. § 636(b)(1)(C) and Local Rule 30(a)(3), any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt thereof. Failure to file objections within the specified time waives the right to appeal a District Court Order adopting this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a) and 6(e); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 30(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 30(a)(3), or with the similar provisions of Rule 30(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**